WARREN v. BURT et al.

(Circuit Court of Appeals, Eighth Circuit. September 18, 1893.)

No. 177.

PRINCIPAL AND AGENT — INTEREST OF AGENT IN PURCHASE FROM PRINCIPAL—
ACCOUNTING TO PRINCIPAL FOR PROFITS.

In a suit to compel a real-estate agent employed by plaintiffs, former owners of a farm in Illinois, to pay plaintiffs certain profits derived by them from an exchange negotiated by the agent, and to cancel a contract made in payment of his commissions, it appeared that the agent showed plaintiffs a tract of land in Missouri which had been for sale for years at $9,000, stated it to be worth at least $32,000, and persuaded them to contract for an exchange of properties with one of the defendants, having no interest in the tract, falsely stated by him to be the owner's agent. Another defendant obtained an option on the tract for $9,500, and thereafter conveyed it to plaintiffs in fulfillment of the contract, and received a conveyance of the farm. To facilitate the exchange, still another defendant loaned plaintiffs the cash requisite to carry out the contract, and took back a trust deed therefor, and the agent waived his commission in cash, and took in lieu thereof a contract for one-half the profits to be derived from a future sale of the property. Subsequently, the agent traded the Illinois farm at a profit of about $8,000, which was divided among all the defendants, the agent receiving $1,050. Defendants had previously operated together in other "real-estate deals," and divided the profits. *Held,* that the agent's ignorance or concealment of the ownership or price of the Missouri tract, his waiver of cash commission, and his receipt of a share of the profits of the farm largely in excess of the usual commission were sufficient proof that he was interested in forwarding the schemes of his codefendants for a share in the profit, and entitled plaintiffs to the relief sought against him.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

In Equity. Bill by Robert F. Burt and Charles Scudder, public administrator in charge of the estate of Robert H. Gardner, against Thomas H. Warren, Frank G. Flanagan, Benjamin F. Hammett, Charles Hewitt, and Benjamin F. Webster, for an accounting of profits realized by the trade of a farm formerly belonging to Burt and Gardner, and to cancel a contract between them and defendant Warren. The bill was dismissed as to the defendants other than Warren, and he appeals from a decree against him in favor of plaintiffs. Affirmed.

Statement by SANBORN, Circuit Judge:

This is an appeal from a decree against Thomas H. Warren, a real-estate agent, directing him to pay back to his principals certain profits he derived from the purchase of property of theirs he was selling as their agent, and canceling a certain contract he took from them in payment of his commission. Robert F. Burt, one of the appellees, brought the bill for this relief against Warren, and Frank G. Flanagan, Benjamin F. Hammett, Charles Hewitt, and Benjamin F. Webster, who were alleged to be associates of Warren in the purchase, and he joined as a defendant Charles Scudder, the public administrator of the estate of Robert H. Gardner, the other principal, who had died. The suit arose from these facts:

On October 13, 1882, Burt and Gardner owned a farm of 285 acres situated in Madison county, Ill., a few miles from the city of St. Louis, Mo. They resided in Columbus, Ohio, and had employed the appellant, Warren, who resided in St. Louis, Mo., to negotiate a sale or exchange of their farm, and had agreed to pay him a commission of 5 per cent. on the price at which such sale or

exchange should be effected. A few days before October 13, 1882, they came to St. Louis. Warren took them to see a tract of land 32 acres in extent, situated in the city of St. Louis, which was then owned by Mrs. Fanny Deaver, told them that it was worth at least $32,000, and persuaded and assisted them to negotiate and make a contract with one William J. Haynes, a straw man who was furnished by the defendant Flanagan, and who had no title or interest in the land, whereby they agreed to convey to him their farm, which they estimated in the trade at the value of $18,000, and to pay him $3,500 in cash for the Deaver tract, subject to a trust deed for $5,000; that is to say, he persuaded them to agree to give their farm and $8,500 for the Deaver tract. Before this contract was made, the defendant Flanagan, accompanied by the defendant Hewitt, had obtained an option from the agent of Mrs. Deaver to purchase this land for $9,500 dollars, and, immediately after it was made, Flanagan bought it for that sum, and then conveyed it to Burt and Gardner in pretended fulfillment of the Haynes contract, and received from them a conveyance of their farm to himself. In August, 1883, the defendant Warren traded off this farm for Flanagan and his associates on such terms that they made a profit of about $8,000 on their trades in it. When the latter trade was consummated, Warren received $1,050, which was found by the court to be his share of the profits, and was alleged by him to be his commission on the latter sale. The contract of Burt and Gardner with Haynes was made October 13, 1882. On the same day, to facilitate the negotiations, Warren waived his right to his commission of 5 per cent. in cash, and took from Burt and Gardner, in lieu thereof, a written contract whereby they agreed that he should have one-half of the remaining proceeds arising from the sale of the Deaver tract after the expenses of selling it should be paid, and they should have received $28,500, and interest at 6 per cent. from the date of the contract. He placed this contract on record, and at the commencement of this suit claimed an interest in this land under it. The complainant brought his bill for a cancellation of this contract, and an accounting of the profits which Warren and his associates made out of their trades in the Madison county farm, on the ground that, while Warren was pretending to act as agent of the complainant and Gardner, he was in fact a partner with the defendants Flanagan, Hammett, Hewitt, and Webster in the purchase of the Deaver tract for $9,500 and its transfer to Burt and Gardner for their farm, and that he assisted to make and shared in the profits of the disposition of the farm made by Flanagan and his associates in August, 1883. The defendant Warren denied any knowledge of, or participation in, the purchase of the 32 acres, denied that he ever had any interest in the farm or the profits of the trades in it, and insisted that he had discharged his duty to his clients faithfully. The court below found that after Warren had learned on what terms his clients would exchange their farm for the Deaver tract he had entered into an arrangement with the defendants Hammett, Flanagan, Webster, and Hewitt to the effect that Flanagan should buy the 32 acres at the lowest possible price, that it should then be exchanged for the farm on the terms Burt and Gardner had assented 'to, and that whatever profits were made should be so divided that Flanagan, Webster, and Hewitt should have one-half, to be divided among them as they chose, and that Hammett and Warren should have the other half, to be divided between them as they might agree, and that this arrangement was carried out. The case was then referred to a master to take an account of the profits Warren had received. He reported the amount to be $1,050, the report was confirmed, and a final decree rendered, canceling the contract of October 13, 1882, between Warren and Burt and Gardner, and adjudging that the complainant Burt and the administrator of the estate of Gardner recover of the defendant Warren the $1,050 profits he received, with interest and costs. From this decree, Warren appeals. The bill was dismissed against the other defendants because it was not alleged and proved that they were the agents of, or occupied any fiduciary relation to, Burt and Gardner.

John R. Christian, (Frederick A. Wind, on the brief,) for appellant.

William B. Thompson, (P. R. Flitcraft, Willi Brown, and Henry E. Mills, on the brief,) for appellees.

Before BREWER, Circuit Justice, and SANBORN, Circuit Judge.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The law guards the fiduciary relations with jealous care. It aims to prohibit the possibility of a conflict between the duty of a trustee and his personal interest. It demands that he look solely to the interest of his cestui que trust; that the agent work with an eye single to the welfare of his principal. It prohibits the agent from all speculation or profit in the subject-matter of his agency, and visits such a breach of duty, not only with loss of the profits gained, but with loss of the compensation which a faithful discharge of duty would have earned. The interests of vendor and purchaser are diametrically opposed. To the vendor the highest price, to the purchaser the lowest price, is the greatest good. For the agent of a seller to permit himself to become interested in a purchase from his principal is to inaugurate so dangerous a conflict between duty and self-interest that this has long been wisely and strictly forbidden. No man, whether he be principal or agent, can be a vendor and a purchaser at the same time, and an agent of a vendor who intentionally becomes interested as a purchaser in the subject-matter of his agency violates his contract of agency, betrays his trust, forfeits his commission as agent, and is liable to his principal for all the profits he makes by his purchase. Michoud v. Girod, 4 How. 503, 554, 555; Crump v. Ingersoll, 44 Minn. 84, 46 N. W. Rep. 141; Hegenmyer v. Marks, 37 Minn. 6, 32 N. W. Rep. 785; Jacobus v. Munn, 37 N. J. Eq. 48, 53; Moore v. Zabriskie, 18 N. J. Eq. 51; Perry, Trusts, § 919; Bank v. Tyrrell, 27 Beav. 273, 10 H. L. Cas. 26; Panama, etc., Tel. Co. v. India Rubber, etc., Co., 10 Ch. App. 515, 526; Bent v. Priest, 86 Mo. 475, 482.

There is no contention concerning these propositions of law. It is conceded that if Warren, while he was the agent of the vendors, entered into an arrangement with any of the purchasers whereby he was to have an interest in the purchase, or the profits of the purchase, of the Deaver tract, or of the farm for which it was exchanged, the decree should be affirmed. It is conceded that he was the agent of these vendors to effect an exchange of their farm for other property, and that, as such, he advised and persuaded them to effect the exchange in question; but it is strenuously insisted that he was not interested in Flanagan's purchase of the Deaver tract, or in the profits of the exchange of this tract for the farm. The court below found that he was so interested, and the only question presented by the assignment of errors in this case is whether the evidence warrants that conclusion. The result below casts so serious an aspersion upon the character of the agent for honor and integrity that this case demands, and has received, the most careful and patient consideration. The profits of the transaction were finally realized in 1883 by an exchange of the farm for some houses on Caroline street, in St. Louis, and the disposition of these houses through trust deeds and a conveyance of the fee. The witnesses, in speaking of this transaction, from its inception in the

purchase of the Deaver tract, through the exchange of the farm for that 32 acres, the trade of the farm for the Caroline street houses, and the disposal of those houses for money, call it a "real-estate deal." The following facts respecting this deal are either admitted or conclusively proved by the record: The defendants Frank G. Flanagan, Benjamin F. Hammett, Charles Hewitt, and Benjamin F. Webster were dealers in real estate in St. Louis, and were all interested in and shared in the profits of this "deal." The defendant Warren was a dealer in real estate, and well acquainted with all of these defendants. Hammett and Warren had been partners in the purchase and sale of many pieces of real estate where the latter furnished the information and the former the money. Webster and Flanagan were general partners, and Hewitt had been a partner with them in the purchase and sale of many pieces of real estate where he furnished the information and they supplied the money. These five men had before been interested together in the purchase and sale of some real estate, and in every such case Hammett and Warren had received one-half the profits, and Flanagan, Webster, and Hewitt the other half. The Deaver tract of land had been for sale for many years for about $9,000. Before it was shown to Burt and Gardner, Flanagan, in the presence of Hewitt, obtained an option to purchase it for $9,500 from the agent of the owner, Mrs. Deaver. Before this tract was shown to Burt and Gardner, Hewitt had informed Warren that it was the cheapest piece of property in the city at the price it could be bought for, but he was unable to remember whether he told him the price at which it could be bought. After Warren had received this information, and Flanagan had obtained this option, Warren, in company with either Hewitt or Hammett, took his principals, Burt and Gardner, to see this land; told them that it was worth from one thousand to fifteen hundred dollars an acre; that Flanagan was Mrs. Deaver's agent and controlled it; and advised and persuaded them to make the contract with Haynes to give their farm and $3,500 in cash for this tract, subject to an incumbrance of $5,000. Burt and Gardner objected to paying Warren's commission and the $3,500 in cash, and thereupon, in order to effect the trade, Hammett agreed to loan them the $3,500 on their trust deed upon the Deaver tract second to the $5,000 incumbrance, and Warren took the contract in suit in lieu of his commissions. Flanagan produced the man Haynes, who signed the contract of exchange with Burt and Gardner, and then they returned to their residence in Columbus, Ohio. This contract was made October 13, 1882. On October 18, 1882, Mrs. Deaver made the deed of her tract to Flanagan. On the same day, Flanagan made the deed of this tract to Burt and Gardner. On October 19, 1882, Burt and Gardner made a trust deed of the Deaver tract to Hammett's trustee to secure their notes to Hammett for the $3,500, and on the same day they made a deed of their farm to Flanagan. These deeds were all placed in trust with one Obear, in the city of St. Louis, where they remained pending the perfection of the titles until November 27, 1882, when they were delivered. On the next day the defendant

Hewitt sold the notes of Burt and Gardner that were payable to Hammett, which the latter had indorsed without recourse, for $3,200. The amount of money paid for the Deaver tract was only $4,500, as the $5,000 incumbrance was deducted from the price, so that the dealers obtained the farm for about $1,300. In August, 1883, the defendant Warren negotiated an exchange of this farm, and 80 acres adjoining it that Hammett owned, for the houses on Caroline street, which were immediately disposed of, so that a net profit of a little over $8,000 was realized from the deal. Immediately after the trade of the farm for the Caroline street houses, Hammett paid Warren the $1,050, which they testify was his commission for making this exchange, but which the court has found was a part of the profits of the transaction. Hammett then paid half of these profits to Flanagan and Webster, who divided with Hewitt, and this "real-estate deal" was closed.

It was the duty of this agent, Warren, to use reasonable diligence to learn the lowest price at which the Deaver tract could be bought, and to buy it for his principals, or give them an opportunity to buy it, at that price. If they did not wish to buy, and desired only to make an exchange of their farm for other property, then it was his duty to use diligence to get information of the price, and communicate it to them, to the end that they might make the best trade possible. This 32 acres of land had been for sale for $9,000 for years. A single honest effort by Warren would have disclosed its price. His friends Flanagan and Hewitt had no difficulty in learning it, and obtaining an option to purchase it for $9,500, before Warren took his clients to see it. It is perfectly obvious that they never intended to accept the offer, or to buy the land, unless Warren succeeded in persuading his clients into some trade very advantageous to them; indeed, Flanagan testifies that he did not have the money to pay for it. The contract with Haynes, who had no money or property or interest in this land, was but a device to conceal the real parties in interest. This Haynes contract was made October 13, 1882, and the deeds were not exchanged until November 27, 1882, although Flanagan closed his option for the purchase October 18, 1882. During all this time, Warren was corresponding with his clients about consummating this trade, and at one time arranged an extension of time to complete it. Instead of a cash commission of $900 he took an agreement for one-half the surplus proceeds above $28,500 and interest, to be realized at some indefinite future time from the sale of a piece of land that had just been bought for $9,500. It is incredible that this agent, if he was expecting no other compensation, should have waived his commission for such a contract. It is incredible, if he was working solely in the interest of his principals, that he could not, or did not, learn and know who owned this land, and what its price was, before the Haynes contract was made; that he could be told that it was the cheapest piece of property in St. Louis, and not learn that its price was $9,500 and not $26,500; that his friend Flanagan could have

bought it at this price, and have held it from October 18th to November 27th, without his learning the price paid for it; and, if he did learn it, it is incredible, if he was working solely in their interest, that he would permit his clients to trade away a farm they valued at $18,000, and that was worth at least $5,000, for a bare · thousand dollars, for that amount of money would have bought the Deaver tract, subject to the two trust deeds under which Burt and Gardner took it. There is but one rational explanation of such ignorance or concealment of facts, such carelessness of his client's interest. It is that he was interested with the · purchasers, and forwarding their scheme in consideration of a share in its profits. In the light of that conclusion, his ignorance or concealment of Mrs. Deaver's ownership of the land and her price for it, his waiver of his cash commission due from his principals, his receipt of the $1,050 from Hammett in August, 1883, on the exchange of the farm, that realized only about $11,000,—an amount far in excess of the usual commission of 5 per cent. on such trades,—his entire course of action becomes consistent and reasonable. The portions of the evidence to which we have adverted are amply sufficient to warrant this conclusion, and there are other indications in this record, many of them slight in themselves, but which together urge us with compelling force to the same result.

Moreover, the circuit court investigated this question, carefully examined this evidence, and came to this conclusion. The case was then referred to a master to take an account of the profits appellant had derived from the transaction. His report was received, excepted to, and confirmed by the court.

Where the court below has considered conflicting evidence, and made its finding and decree thereon, they must be taken as presumptively correct, and unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, the decree should be permitted to stand. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. Rep. 894; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. Rep. 355; Evans v. Bank, 141 U. S. 107, 11 Sup. Ct. Rep. 885; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. Rep. 821.

The decree below is affirmed, with costs.